**ALL INDIAN PUEBLO COUNCIL; San Ildefonso Pueblo; Santa Clara Pueblo; San Juan Pueblo; Jemez Pueblo; Save the Jemez; Sierra Club, Plaintiffs–Appellants,**

v.

**The UNITED STATES of America; Donald Hodel, Secretary of the United States Department of the Interior; Ross Swimmer, Assistant Secretary of the United States Department of Agriculture; Sidney L. Mills, Area Director for Albuquerque of the Bureau of Indian Affairs; Robert Buford, Director of the United States Bureau of Land Management; Richard Lyng, Secretary of the United States Department of Agriculture; Dale Robertson, Chief of the United States Forest Service; John Harrington, Secretary of the United States Department of Energy; Public Service Company of New Mexico; and Los Alamos County, New Mexico, Defendants–Appellees.**

No. 90–2225.

United States Court of Appeals, Tenth Circuit.

Sept. 17, 1992.

Alletta d'A. Belin, Shute, Mihaly & Weinberger, Santa Fe, N.M. (Grove T. Burnett, Glorieta, N.M., with her on the brief), for plaintiffs-appellants.

Katherine W. Hazard, Atty., Dept. of Justice, Washington, D.C. (Richard B. Stewart, Asst. Atty. Gen., and Robert L. Klarquist, Atty., with her on the brief), for defendants-appellees.

Henry F. Narvaez, of Keleher & McLeod, P.A., Albuquerque, N.M. (Margaret E. Davidson and Susan G. Lowrey of Keleher & McLeod, P.A., Albuquerque, N.M., and James W. Moorman and David F. Williams, Cadwalader, Wickersham & Taft, Washington, D.C., with him on the brief), for appellee Public Service Co. of N.M.

Daniel A. Najjar and Randy Bartell, Sutin, Thayer & Browne, P.C., Santa Fe, N.M., and Oliver Miles, County Atty., Los Alamos, N.M., for appellee Los Alamos County, N.M.

Before SEYMOUR and HOLLOWAY, Circuit Judges, and ROGERS,* United States District Judge.

HOLLOWAY, Circuit Judge.

Indian Pueblos and two environmental organizations challenge on procedural grounds and for alleged legal insufficiency an environmental impact statement (EIS) that the Bureau of Indian Affairs (BIA) prepared for the Ojo Line Extension Project, a proposed major electrical transmission line and associated substations to be built by the Public Service Company of New Mexico (PNM) and Los Alamos County, New Mexico. The plaintiff organizations present two principal issues on appeal: (1) whether the district court erred in upholding the decision by the Assistant Secretary of the Interior to deny the appellants an administrative appeal of the BIA's decision to issue the Record of Decision (ROD); and (2) whether, under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, *et seq.*, the EIS adequately evaluated the proposed project, and alternatives to it. We affirm.

I

At the end of a major electric transmission line, Public Service Company of New Mexico's Norton Switching Station was de-

* The Honorable Richard D. Rogers, United States District Judge of the District of Kansas, sitting by designation.

signed to be a primary delivery point of power for the Santa Fe and Los Alamos areas. The Norton station currently is served by a single, 345 kilovolt (kV) transmission line. For several years PNM and Los Alamos County have proposed building a new 345 kV transmission line in order to link the Norton station to an existing 345 kV line, known as the San Juan–Ojo line, to the north. The new line would serve as an alternate major transmission source at the Norton Station in the event of an outage on the existing 345 kV line.

The proposed Ojo Line Extension (OLE) would consist of from 45 to 50 miles of overhead transmission line on a 150–foot right of way and associated substations. In and near the possible paths of the line are the Jemez Mountains, several Pueblos, and significant archeological sites, as well as tribal cultural and religious sites. Because of the possibility that federal agencies would be required to take action on the project to grant or approve rights of way, an environmental impact statement was prepared in compliance with NEPA. Acting as the lead agency for several federal agencies, *see* 40 C.F.R. § 1501.5 (1986), the Bureau of Indian Affairs formally began preparing an EIS for the project in late summer 1984. The BIA issued a draft EIS in October 1985. A comment period followed in late 1985 and early 1986. On August 15, 1986, the BIA issued a 242–page final environmental impact statement (FEIS) for the project.

The FEIS evaluated three major alternatives, including no action or "no approval of rights-of-way or construction." FEIS at xxii. The other alternatives discussed in the FEIS were two possible routes for the new transmission line: (1) a western route, upon which a line would be built in a generally northwesterly direction from the Norton station through the Los Alamos area and would intersect with the San Juan–Ojo line near Coyote, New Mexico; and (2) an eastern route, a path generally extending north of the Norton station through the Española area and connecting with the San Juan–Ojo line at the existing Ojo Switching Station. In addition, the agency analyzed two variations of each of the two proposed routes. The BIA Albuquerque office issued a record of decision (ROD) on September 26, 1986, which selected one of the two western corridor alternatives known as "W–2" as the route for the project.

## II

In late October 1986, the appellants and the State of New Mexico filed an administrative appeal of the ROD challenging the legal sufficiency of the EIS and arguing that the route adopted violated the protections guaranteed by the First Amendment and the American Indian Religious Freedom Act, 42 U.S.C. § 1996. In letters of March 19, 1987, and April 3, 1987, the Assistant Secretary for Indian Affairs dismissed the appeals from the ROD. The letters stated that since the ROD ultimately selected an alternative route which bypasses all Indian lands, there was no substantive decision to be made by a BIA official in reference to the proposed project; any appeal would lie to other agencies having administration of lands to be crossed. Following the administrative denial of their appeal by the Assistant Secretary, the appellants filed this action in June 1987 claiming federal question jurisdiction under 28 U.S.C. § 1331. *See* I R. Doc. 1.

This action was brought in part under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–06, seeking judicial review of the Assistant Secretary's decision to deny the administrative appeal. I R. Doc. 1, at 12 (First Claim). The appellants sought an order mandating the BIA to hear the administrative appeal, *id.* at 16, or an order setting aside the FEIS and directing the agencies to prepare a new environmental impact statement, *id.* at 17. Further, the appellants sought a judicial determination that the final EIS was inadequate as a matter of law under NEPA. *Id.* at 14 (Fourth Claim).[1]

---

1. The appellants' Second and Third Claims alleged that the appellees' actions violated the Indian plaintiffs' rights under the First Amendment and the American Indian Religious Freedom Act. The plaintiffs consented to the entry of partial summary judgment in favor of the

The district court resolved both the issues of the denial of an administrative appeal and the NEPA issues in separate grants of summary judgment in favor of the defendants. On August 25, 1989, the district court granted partial summary judgment in favor of the defendants on the plaintiffs' claim that they were improperly denied an administrative appeal. I R. Doc. 122. The court explained that it viewed the agency's dismissal of the appeal as a final order, that the BIA "contemplates no further action" on the claims, and that the appellants had exhausted the available administrative remedies. *Id.* at 2. The court stated that: plaintiffs had other remedies, namely judicial review by the district court; the plaintiffs had not been cut off from presenting additional testimony and would be allowed to move its admission regarding adequacy of the EIS at a later stage of the proceedings; and the doctrines of exhaustion of administrative remedies and primary jurisdiction did not apply because the BIA had no special expertise to review adequacy of the FEIS. *Id.*

After ruling on the APA claims, the district court on August 15, 1990, granted summary judgment in favor of the defendants on the NEPA issues by a written Memorandum Opinion and Order. I R. Doc. 128.[2] In addressing the appellants' claim that the FEIS inadequately analyzed alternatives to the project, the district judge applied the rule that "if the FEIS is sufficient to inform a decision maker of the major alternatives, it thereby enables the agency to put forth a reasonable determination of the best alternative." *Id.* at 15. The judge explained that in making the ruling he had considered the agency's discussion of the four alternative routes, as well as the "no action" alternative, and had considered the other alternatives that the agency in the ROD explained it had "eliminated from further consideration" after addressing them in "minor detail." Joint App. of PNM tab 2, at 14 (ROD); *see* I R. Doc. 128, at 15–17. In conclusion, the district judge reasoned that the discussion of alternatives was adequate because the FEIS and the ROD "contain an adequate amount of information for the agency to make its decision that the W–2 alternative would best meet the project needs." I R. Doc. 128, at 17.

Concerning the appellants' remaining NEPA contentions, the district judge ruled that the FEIS adequately analyzed the environmental impact of the project. Addressing specific issues, the court ruled that the EIS adequately dismissed the potential impact of the project on the habitat of the Jemez Mountain salamander by referencing a study completed after the statement was prepared. I R. Doc. 128, at 4–5. The court concluded that the EIS also adequately addressed the potential impact of the power line on visual resources. *Id.* at 7. The judge noted that the agency in addressing the issue had acknowledged that "some impairment to visual resources" would occur, and had included in the EIS a description of the methodology used to assess visual impact. *Id.*

Further, the judge rejected the appellants' contention that the discussion of the impact on paleontological and cultural resources was insufficient in part because of the use of tables and charts. The judge noted that the EIS contained a separate review of studies relevant to the issue, and that the condensation of the study data in the tables "reflects that the agency did in fact undertake some analysis of the paleontological and cultural resources within the W–2 corridor." *Id.* at 8. In sum, the district court ruled that the EIS was adequate under the mandate of NEPA and granted summary judgment for the defendants. This appeal followed.

After argument of this appeal, we were advised in an Emergency Application for Injunction Pending Appeal filed on August

---

defendants on the Second and Third Claims in response to *Lyng v. Northwest Indian Cemetery Protective Association,* 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988). *See* Appellants' Opening Br. at 4. No issue concerning these two claims is presented in this appeal.

2. The parties agreed that the plaintiffs' claims were "appropriately suited to disposition on summary judgment motions." I R. Doc. 128, at 3.

31, 1992, that the New Mexico Public Service Commission (PSC or Commission) has held its hearings on the OLE project but has not determined whether to issue a Certificate of Convenience and Necessity for the project. In its proceeding the Commission issued a Preliminary Cease and Desist Order on May 18, 1992, against certain activities related to the construction of the OLE project. On August 3, 1992, the PSC, with one commissioner dissenting, issued an order vacating the cease and desist order in part. The order left in place the Commission's directive prohibiting PNM from conducting "intensive data recovery" as a part of "archaeological mitigation and site protection activities." *In re Public Service Co. of New Mexico,* No. 2382 (N.M.Pub.Serv.Comm'n Aug. 3, 1992) (order vacating in part preliminary cease and desist order). This order allowed PNM to initiate or to continue some activities preliminary to construction, including nonintrusive "archaeological mitigation and site protection," geotechnical and centerline surveying, tree marking, and a "solid waste management unit survey." *Id.*[3]

The emergency application to this court of August 31 sought injunctive relief to restrain some activities related to the OLE project, including "archaeological material removal and data recording," tree cutting and painting as part of a centerline survey, and use of heavy equipment and drilling for core soil samples at proposed tower sites as part of a geotechnical survey. On September 1, 1992, this court granted a temporary injunctive order, directed prompt filing of responses, and later granted leave for a reply thereto.[4] In view of the conclusions we reach in this opinion, our temporary injunctive order of September 1 is being vacated forthwith upon the filing of this opinion.

## III

First, the appellants contend that they were improperly denied an administrative appeal of the Area Director's decision to issue the ROD by the Assistant Secretary. The district court granted summary judgment for the defendants on this issue, holding that the appeal was properly dismissed. We review the court's grant of summary judgment on the issue de novo. *Osgood v. State Farm Mut. Auto. Ins. Co.,* 848 F.2d 141, 143 (10th Cir.1988). The court found that the Assistant Secretary had acted properly in foreclosing the appeal and that in any event the parties' claims could be equally well litigated in the district court.

On appeal, the appellants argue that the regulations applicable at the time their administrative appeal was denied guaranteed them a right to appeal. The regulations provided for appeals from "actions or decisions by officials of the Bureau of Indian Affairs where the action or decision is protested as a violation of a right or privilege of the appellant." 25 C.F.R. § 2.2 (1986). The Assistant Secretary's claim that he did not have jurisdiction over the administrative appeal thus seems to the appellants a violation of a right clearly established in the regulations. In response the Appellees have made a number of arguments. In the district court they contended that the adoption of the FEIS and the issuance of the ROD were not "actions or decisions" as contemplated by the regulations. On appeal, they stress their view that the harms the appellants claim to have suffered do not involve the violations of any "rights or privileges" as they are defined in 25 C.F.R. § 2.1. Whatever the merits of these claims, we need not address them here because, as explained below, any error which occurred in the dismissal of the administrative appeal was harmless in view

---

**3.** The New Mexico Attorney General petitioned the New Mexico Supreme Court for a writ of mandamus directing the Commission to vacate its order allowing activities in preparation for construction. On August 26, 1992, the New Mexico Supreme Court denied the petition for a writ of mandamus. *Attorney General v. New Mexico Pub. Serv. Comm'n,* No. 20,737 (N.M.

Aug. 26, 1992) (order denying petition for a writ of mandamus).

**4.** Our order enjoined PNM "from proceeding with construction of Ojo Line Extension 345 kV Transmission Project pending further order of the court." *All Indian Pueblo Council v. United States,* No. 90–2225 (10th Cir. Sept. 1, 1992).

of the posture of the administrative proceeding.

■ Regardless of whether the Assistant Secretary erred by denying the plaintiffs' appeal on jurisdictional grounds, such error would not require reversal unless it prejudiced the plaintiffs. *See* 5 U.S.C. § 706 (1988) ("due account shall be taken of the rule of prejudicial error"). The harmless error rule applies to judicial review of administrative proceedings. *Trench v. INS*, 783 F.2d 181, 183 (10th Cir.), *cert. denied*, 479 U.S. 961, 107 S.Ct. 457, 93 L.Ed.2d 403 (1986). It is true that the Assistant Secretary had discretion to grant or deny the plaintiffs' request that the FEIS be withdrawn. However, the briefs in support of the administrative appeal did not ask the Secretary to use such discretionary power. Rather the only arguments they marshalled were challenges to the *legal* sufficiency of the FEIS. I Appellants' Addendum of Exs. 152–86; II Appellants' Addendum of Exs. 287–333.[5] In light of this posture of the case before us, we hold that the denial of the administrative appeal should not now be held prejudicial error by us. The legal issues raised by the administrative appeal concerning the FEIS have been considered and decided on their merits by the district court. All of the issues which appellants wished to appeal further to us have been presented here and are decided on their merits again in this opinion. To reverse now and remand to the district judge for him to remand to the agency to consider these legal issues we are prepared to decide would be an exercise in futility—one not in accord with "the rule of prejudicial error." 5 U.S.C. § 706 (1988).

■ The National Environmental Policy Act in conjunction with the Administrative Procedure Act gives the plaintiffs the right to challenge the legal sufficiency of an EIS in federal district court. 5 U.S.C. § 706. The APA affords them the opportunity for the exact kind of review they were seeking by the legal issues they raised before the Assistant Secretary under 25 C.F.R. § 2.3. A lower tribunal's action in foreclosing a line of legal argument is harmless error if there is a right to de novo review upon appeal. *See Pittsburgh & Lake Erie R.R. Co. v. ICC*, 796 F.2d 1534, 1543 (D.C.Cir.1986) (error of ALJ in denying statutory right to file briefs not reversible where party had opportunity to submit ample written testimony to ALJ and was able to fully brief case when Commission conducted its de novo review of ALJ's decision); *Legal Aid Soc'y v. Brennan*, 608 F.2d 1319, 1329 (9th Cir.1979) (any error in failure to join a party in district court was harmless where party was present on appeal and only issues were legal issues subject to full review on appeal), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980); *State v. Pollock*, 38 So.2d 870, 873 (Ala.1948) (trial de novo by district court on appeal from state tax department renders immaterial any error or informality before the administrative tribunal unless it involves an entire change of parties or form of action). And the Supreme Court has held that although no hearing was required before an administrative finding premising seizure of misbranded articles, due process was satisfied since libels had to be filed against the owner who had an opportunity to appear and have a full hearing before a court. *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 598, 70 S.Ct. 870, 872, 94 L.Ed. 1088 (1950); *see also* 2 Kenneth C. Davis, *Administrative Law Treatise* § 12.13 (1984). This is the essence of what the plaintiffs received here.

Thus because the review the plaintiffs received in the district court was identical in scope to that which they sought from the Assistant Secretary in their effort to appeal, the procedural errors they allege were harmless. The order below upholding the Assistant Secretary's dismissal of the

---

5. The conclusion of the appellants' brief requests that the decision of the Area Director to implement the W–2 alternative for the OLE project "be reversed on the grounds that his decision violates Indian appellants' first amendment rights and their rights under [the American Indian Religious Freedom Act], and because his decision violates both NEPA and NHPA." *Id.* at 185.

administrative appeal should not be disturbed.

## IV

We turn now to the appellants' contentions challenging the sufficiency of the EIS.

### A

Environmental impact statements are among the procedures that NEPA mandates in order to effect "a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348, 109 S.Ct. 1835, 1844–45, 104 L.Ed.2d 351 (1989). NEPA requires all federal agencies to prepare an EIS for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EIS serves the goals of NEPA in part by ensuring

> that the agency, in reaching its decision, will have available and will carefully consider detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

*Robertson*, 490 U.S. at 349, 109 S.Ct. at 1845. An EIS must contain a detailed statement about

> (i) the environmental impact of the proposed action,
>
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
>
> (iii) alternatives to the proposed action,
>
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
>
> (v) any irreversible and irretrievable commitments of resources which would

be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C) (1988).

The discussion of alternatives that § 4332(2)(C)(iii) requires is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14 (1986). NEPA requires a "detailed" EIS *"to ensure that each agency decision maker has before him and takes into proper account all possible approaches to a particular project* (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance." *Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C.Cir.1971) (emphasis added). As another court observed, "[i]t is absolutely essential to the NEPA process that the decisionmaker be provided with a detailed and careful analysis of the relative environmental merits and demerits of the proposed action and *possible alternatives*, a requirement that we have characterized as 'the linchpin of the entire impact statement.'" *Natural Resources Defense Council v. Callaway*, 524 F.2d 79, 92 (2d Cir.1975) (emphasis added). We agree that a thorough discussion of the alternatives is imperative.

In addressing alternatives to a proposed action in an EIS, federal agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a) (1986). Concerning the requisite level of detail necessary, "[w]hat is required is information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned." *Natural Resources Defense Council, Inc. v. Morton*, 458 F.2d 827, 836 (D.C.Cir.1972), *quoted with approval in Environmental Defense Fund, Inc.*, 619 F.2d at 1375. NEPA does not require agencies to analyze "the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or ... impractical or ineffective." *City of Aurora v. Hunt*, 749 F.2d 1457, 1467 (10th Cir.1984).

As the Supreme Court has noted, "it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson*, 490 U.S. at 350, 109 S.Ct. at 1846; *see also, e.g., Environmental Defense Fund, Inc. v. Andrus*, 619 F.2d 1368, 1374 (10th Cir.1980) (explaining "requirements of NEPA ... apply to procedure and do not undertake to control decision making"). In reviewing a challenge to the adequacy of an EIS, then, our job is not to "second-guess the experts" in policy matters but rather it is to determine "whether the statement is a good faith, objective, and reasonable presentation of the subject areas mandated by NEPA." *Manygoats v. Kleppe*, 558 F.2d 556, 560 (10th Cir.1977); *see also, e.g., Save Our Invaluable Land (SOIL), Inc. v. Needham*, 542 F.2d 539, 542–43 (10th Cir.1976) (explaining "an EIS is to be tested by the concepts of 'good faith' and a 'reasonable' discussion of the five mandated areas of subject matter"), *cert. denied*, 430 U.S. 945, 97 S.Ct. 1580, 51 L.Ed.2d 792 (1977).

■ Stated another way, in considering a challenge to the adequacy of an EIS a "court should 'ensure that the statement contains sufficient discussion of the relevant issues and opposing viewpoints to enable the decisionmaker to take a "hard look" at environmental factors, and to make a reasoned decision.'" *Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 294 (D.C.Cir.1988) (quoting *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 371 (D.C.Cir.1981)). Thus, we test the discussion of alternatives in an EIS under a "rule of reason" standard of review. *See Environmental Defense Fund, Inc.*, 619 F.2d at 1375 (noting, "test the agencies must meet in dealing with the environmental aspects of proposed action is anchored to the 'rule of reason' ").

### B

The appellants assert that here the BIA failed to adequately analyze the reasonable, and less environmentally damaging, alternatives to construction of the Ojo Line Extension, specifically demand side planning (or managing energy demand), "no action," upgrading of existing 115 kV transmission lines, and increasing the local electric generation capacity at Los Alamos. Relying on expert opinion, the appellants contend that a combination of all of the alternatives could have satisfied the goals of the proposed line extension. The final EIS addresses, if briefly, each of the alternatives that the appellants identify. The appellants, however, generally criticize the alternatives discussion as conclusory.

■ In a section entitled "Demand Side Planning," the EIS acknowledges PNM's conservation programs. FEIS at II–3. The EIS notes that PNM's load forecast "includes the effects of conservation and load management efforts ... [which] will have a significant impact on the growth of peak demand in the coming years, either by shifting sales to the off-peak period or by flattening sales in the on-peak period." *Id.* at II–3 to –4. The EIS explains that the agency dropped further consideration of the demand side planning alternative because additional conservation would be "unrealistic," absent an unlikely shift in national priorities and additional conservation mandates or incentives. *Id.* at II–4.

The appellants rely in part upon expert opinion that demand side planning could have achieved the project objectives of creating an Ojo–to–Norton loop with adequate capacity, and increasing electrical capacity in the Los Alamos area. We believe this argument largely challenges a matter within the agency's policy making discretion. We hold that the agency's discussion of demand side planning, although abbreviated, was adequate under the requirements of NEPA, because it explained why the alternative was rejected.

■ In an EIS, an agency must "include the alternative of no action." 40 C.F.R. § 1502.14(d) (1986). Addressing the issue in a section entitled "The No Action Alternative," the agency explained that the options included: "1) refusal of the federal permitting agencies to grant permits and rights-of-way and 2) no expansion of transmission or generation facilities." FEIS at

II–10. The discussion implicitly explains that the agency rejected the no action alternative because it would not address the problem of major 345 kV line outages, and the related overloading of the 115 kV transmission system from Ojo to Norton. *Id.* We hold that this discussion was adequate because it explained with some detail why the agency rejected the no action alternative.

■ The agency addressed briefly, and rejected, the alternative of expanding and rebuilding the 115 kV transmission system between Ojo and Norton. FEIS at II–5. The agency explained that "[r]oughly eight 115 kV lines" between the Ojo and Norton stations, other line rebuilding, and installation of additional transformers would be necessary in order to provide the desired transmission capacity and to prevent overloading. *Id.* In addition, the agency noted, eight 115 kV lines would require a right of way 400 feet wide. *Id.* The agency concluded that "[t]his alternative is neither technically nor economically justified." *Id.* We hold this discussion was adequate under NEPA.

■ The agency also devoted a section to "Construction of Additional Local Generation." FEIS at II–8. The discussion notes that because of the availability of surplus power in the region, "it is more cost-effective to utilize such power than construct on-site generation." *Id.* Further, the agency explained that it rejected solar and wind power generation because they would not be dependable. *Id.* The agency also rejected the construction of additional 115 kV lines in the Los Alamos area as neither cost-effective nor practical, in part because of the environmental impact of the number of lines and the large amount of right of way necessary. *Id.* The EIS also addressed the effect of conservation measures on local generation, concluding that continuing expansion of the Los Alamos National Laboratory "exceeds the effects of energy conservation load reductions." *Id.* at II–9. We hold that the discussion of the alternative of additional local generation was sufficient.

In sum, we hold that the discussion was adequate to demonstrate that the decision maker considered the alternatives and gave plausible reasons why they were rejected.

## C

■ The appellants also challenge the adequacy of the BIA's evaluation of the potential environmental impact of the project. First, the appellants challenge the sufficiency of the analysis of cultural resources. The FEIS evaluates in general terms the potential impact of the possible corridors on historical and archeological sites. Addressing the impact on religious sites, the agency concluded that none of the possible routes would "physically impact any known religious sites and have been designed to avoid them by a sufficient buffer so that there should be no effect on the practice of Native American religion." FEIS at IV–22, IV–25. The agency quantified as "high," "medium," or "low" the possible environmental impacts on "resources" including archeology, biotic resources, land use, soils, threatened and endangered species, and visual resources; charts in the FEIS show, for each resource, the number of miles of each corridor alternative that the agency placed in each of the three categories.

The appellants contend in general that the analysis is inadequate, and in particular that the charts contain no analysis. We disagree. As the district judge noted, the FEIS contains

> a review of the existing studies of the mountain and valley alternative areas, inventory data, the results of a vehicle [reconnaissance] of the study areas, a review of the site files at the Laboratory of Anthropology, and the results of an on-the-ground [reconnaissance] survey of the areas adjacent to the known concentration of archeological sites.

I R. Doc. 128, at 8. We agree with the district judge that the charts condensed the available information, and reflected that the BIA "did in fact undertake some analysis of the paleontological and cultural resources within the W–2 corridor." *Id.* at 8. We conclude the discussion in the FEIS of

the potential environmental impacts on archeological sites, as well as on Pueblo Indian religious practices, was sufficient.

■ Second, the appellants challenge as insufficient the discussion in the FEIS about threatened, endangered, and sensitive species. The appellants argue that the FEIS is inadequate because it contained just a brief reference to the Jemez Mountains salamander. They also argue that the FEIS is inadequate because it does not mention two species of birds, the Mexican spotted owl and the northern goshawk. In a brief discussion about the Jemez Mountains salamander, the FEIS mentioned possible measures for mitigating the destruction of habitat. FEIS at IV–16. We conclude the discussion about the Jemez Mountains salamander was adequate. We also cannot conclude that the lack of discussion about the two bird species made the EIS inadequate on this record.

■ Third, the appellants contend that the discussion about the potential impact on visual resources was insufficient. The FEIS contains a lengthy discussion of methodology and mitigation measures. We agree with the district court that the FEIS reasonably addressed the issue. *See* I R. Doc. 128, at 7–8.

### V

In sum, we are convinced that the district court properly upheld the actions of the BIA and the sufficiency of the EIS, and accordingly we AFFIRM the judgment and orders of that court. In light of this conclusion, the temporary injunction entered by this court on September 1, 1992, is VACATED effective upon the filing of this opinion.